Clerk, please call the next case. 111-1449 James Ublasi v. IHC Construction Company May it please the Court, Counsel. My name is John Popelka. I'm here on behalf of the Plaintiff James Ublasi. Our argument rests, we have several arguments that we are putting forth. The first issue, though, that I'd like to raise is the issue of waiver. We raised this in our reply brief, asking that the sanction of waiver be applied in this particular case with respect to the consideration of counsel's brief and taking away his opportunity for oral argument, for failure to cite to the record. The reason I raised it here is I raised it below in the circuit court. We have the same situation in the circuit court. I filed the motion, I raised the issue, and instead the circuit court judge allowed counsel time to amend his brief and put the proper citations to the record. I lived with that. That's understandable. But now we are here before this Court and we have the same situation. And it appears that the appellee did not learn its lesson below. And now, before this Court, does not cite to the record, to this Court's record, in its statement of facts or its argument section. So we ask that waiver, the sanction of waiver, be imposed. On consideration of their brief and oral argument. Any alternative? Now, did you file anything in that respect before this Court? I'm sorry, Your Honor? Did you file a motion? A motion? Are you just doing this now? I believe that I filed the motion. In the circuit court, I believe I filed the motion. Are you talking about this Court, Your Honor? Yes. No, I raised it in my reply brief. It is on page 2 of my reply brief. It's the first argument. It hardly gives us an opportunity to correct the problem, does it? By raising it in your reply brief as opposed to by motion? If you would have raised it by motion, we could have stricken his brief and ordered him to write a new one. Well, perhaps I didn't take the right steps then. I thought by addressing it in the reply brief that, okay. Lesson learned on both sides, maybe. Yes. I'll go on. With respect to the issue of the lumbar condition, the lumbar condition was found not to be causally related. This is a manifest weight argument. The commission found that the low back condition was not related based upon Dr. Butler's first report from March of 2006, in which Dr. Butler stated there was no evidence of medical care or complaints of low back pain prior to November 17 of 2005. And the commission also referenced that, that there was no, that the first date of treatment of, or any report of low back problems was November 17 of 2005. The date of the accident was October 25 of 2005. The petitioner's testimony was that he twisted his neck, right shoulder, his right hand, and his low back in this injury. He testified he had an immediate onset of severe pain in the low back. Well, let me just ask you that. And, again, I mean, a lot of this, as you know, in many of these cases, turns on the commission's assessment of the weight of the evidence to credibility of the witnesses. Claimant maintains that he complained of low back pain when he presented at Mercy Works the day of the accident. Correct? Yes. Did a review of the reports of Mercy Works, however, indicate it did not support that contention? Wasn't that one of the threshold problems? No, Your Honor. The history presented to Mercy Works was that he had complained of low back pain, of back pain. It concludes, includes a complaint of back pain. The diagnostic and treatment notes address only cervical strains and contain no mention of lumbar injury. Is that correct? The initial, well, the treatment he received was not addressed to his lumbar spine, but he made mention of it. He made mention prior to that. Right after the accident occurred, he was driven to the hospital and filled out an accident report. The accident report references that he injured his low back. That occurred within a half hour of the accident. On the way to Mercy Works, he made mention of it to the gentleman who drove him who filled out the accident report. When was it first diagnosed? How long after the date of the alleged injury was lumbar strain actually diagnosed by anybody? Well, after he left Mercy Works, which was the first facility he went to, he went to his doctor two days later, Dr. Brash. Dr. Brash, he gave a report of low back injury, and Dr. Brash ordered lumbar x-rays. So at the first office visit with his physician on October 27, Dr. Brash ordered x-rays of the lumbar spine. At the next visit with Dr. Brash, he makes mention of lumbar spine injuries. November 17 of 2005, Dr. Brash orders a second set of lumbar x-rays. That's all within the first three weeks, two and a half weeks, three weeks of the accident, and that's the third doctor appointment that he had. Of the three appointments he had had since the accident, at two of them he had lumbar x-rays ordered. So it was finally diagnosed about five weeks after the accident, correct? Roughly. Diagnosed five weeks after? When did Brash diagnose lumbar strain? When did he actually come to that conclusion? Well, initially when he saw him in order to get x-rays on the 27th of October. Okay. And that's when Brash diagnosed lumbar strain? That's when he diagnosed there was a lumbar condition that warranted x-rays. Okay. And then at every subsequent appointment, as a matter of fact, Dr. Brash treated this gentleman for his shoulder. He was the shoulder surgeon. For the other conditions, including the lumbar spine and the cervical spine, he referred this gentleman out to other physicians. However, despite the fact he wasn't treating him for the lumbar spine, in all of his records leading up to the right shoulder surgery, which happened in December of 2005, he notes that the claimant had low back pain. And then at the preoperative, postoperative visit after the shoulder surgery on December 16th, which is roughly eight days after the shoulder surgery, his history is continued neck and low back complaints. Let's assume at some point you've established, for the sake of the argument, I think you've pointed some facts that would suggest that Brash's conclusions supported your claimant's claim. Then fast forward, you have Dr. Butler, who opined the condition was due that he notched a normal degenerative process of aging. So you have an ostensible conflict between the two experts. Why couldn't the commission believe Butler over Brash? Because what Dr. Butler said, I don't believe Dr. Butler said all this represents, at the first visit is a normal degenerative process in the back. His opinion was the first time noted in the medical records that he ever mentioned the low back was November 17th of 2005. Therefore, his low back condition is not related to this accident. Dr. Butler didn't have the proper information before him. He either had the records and didn't look at them, or he looked at them and didn't either notice or disregarded what the findings were. So you're attacking that the foundation of his opinion is flawed. It has to be your position, right? Absolutely. With respect to the low back. At the same time, he was complaining, Mr. Ublase, he was complaining of neck symptoms. His treatment up until Dr. Brash's or Dr. Butler's first appointment wasn't that much different than it was with respect to the lumbar spine, with the exception that a CT, an MRI that had been ordered for the cervical spine did go forward. An MRI that was ordered for the lumbar spine had not yet gone forward when he first saw Dr. Butler. And yet, Dr. Butler concludes that the cervical condition, which only had been, had not been treated, had only been subject to an MRI, was causally related, as was the shoulder condition. His only basis for saying the lumbar condition wasn't related was I don't see it in the records that he's ever complained about it. Well, it was in the records. So what would be the only, looking at the flip side, counsel's argument. The claimant worked here one day, right? Pardon? The claimant just worked for one day? He did. That was his first day. It was a pour on a bridge. And did the arbitrator kind of make it clear that the arbitrator felt the claimant was not credible? He did. But the basis that he found he was not credible was the videotape evidence. Well, what's wrong with looking at the videotape evidence? Nothing at all. But in this case, I believe that the commission abused its discretion in how it used that videotape evidence. The videotape evidence showed this gentleman pushing a stroller, backing his car out, driving to an appointment with his doctor, and his granddaughter, three-year-old granddaughter, climbed up onto his shoulders. The Dr. Brash concluded that in reviewing that evidence and seeing no obvious pain behavior, that therefore the claimant's condition in the cervical spine, which at this point had been diagnosed through MRIs and through clinical examinations and by Dr. Butler himself, has a herniated disc at C5-6 that would require conservative treatment, including therapy and injections. And if that didn't work, surgery. That was Dr. Butler's opinion at the first exam. What happens at the second exam when he looks at the videotape evidence? He had gone through the therapy. He had gone through the injections. He failed at all of the conservative measures. So what should Dr. Butler's opinion be? Okay, I guess he needs the surgery. Instead, Dr. Butler says there's scant evidence that he received any treatment to the cervical spine. There wasn't scant evidence. There was he acknowledges that he didn't have the diagnostic films. He didn't look at the MRIs. He didn't know what procedures and injections had been performed upon my client. Instead, he takes the video to get back to that issue, looks at the video and concludes, ah, based on what I'm seeing from this gentleman from these few minutes out of his life. The pain had resolved itself. No, that's not what he said. He said he has a cervical strain, and now he can go back to work full duty. And that's where the commission abuses its discretion with respect to this videotape. You can't take a videotape that depicts a person's activity level at a certain point in time and use that as a diagnostic tool. You can't use that to say the harm. Who said you can't? Well, it's not logical to do that. It's not a diagnostic tool. You're saying that. I'm sorry. You're the person who is saying that. Yes, I am, Your Honor. Well, think about what you're saying. You have a point, granted. But according to you, if there's some kind of a diagnosis of a medical condition, and then you see somebody, you know, who's doing back flips in the street. But he wasn't. Okay, I'm sorry. I'm sorry. When you have this extensible medical evidence, a videotape can never change the opinions of anybody, according to you. No. Because. No. I'm sorry if I. That's what you implied. I implied that. I'm not implying that. What I'm implying is the videotape evidence was then taken by the commission and used as a basis also to undermine the petitioner's credibility any time his mouth opened. If you recall, well, Your Honor, you just said yourself that a credibility. My question is, is there any case law, any authority that says they can't do that? Well, Your Honor, you just referenced earlier the fact that just because a person is not credible in one instance doesn't mean that he's not credible ever. And what the commission concluded was. You were paying attention in the last case, then, weren't you? I was trying to. And what the commission is saying here is that this gentleman could never have told the truth to his doctors, and therefore his doctors were robbed of the opportunity to give credible opinions themselves, because any time he said what his subjective complaints were, they're undermined as a result of that videotape. Are there any medical records that were submitted to the commission that suggest that he was magnifying his neck symptoms? Well, there was the claim by Dr. Butler that he was malingering at the second examination. But how does a person – I can understand a claim of malingering if the person had had surgery and then just never tells the doctors he gets better, but this is a different situation. Dr. Butler himself said that the condition is related, it requires therapy and injections, and if he doesn't respond, he needs a single level fusion. Those things all happened. He underwent the therapy. He underwent the injections. Dr. Butler never saw those records. The conclusion should be, therefore, he needs to have the surgery. Instead, the conclusion is he's only got a cervical strain. He's malingering. He can't be malingering. We've got three board-certified surgeons who are saying – we've got Dr. Brash, who's an orthopedic surgeon, saying that the neck condition is causally related, he needs surgery. We've got Dr. Wesley Yapour, a neurosurgeon at Northwestern, saying the neck condition is causally related, he needs surgery. And we've got Dr. Brown at CINN saying the neck condition is related, he needs to have the surgery, even after reviewing Dr. Butler's report. So we've got all of this credible evidence, and Dr. Butler himself. I mean, if you take this video, his – He said to Dr. Butler it was such an important testimony. What did he say? He was malingering? He said he was malingering and he said that the video – Ignore that. Commissioners have to ignore that? Well, I think the commission has to – you can make an inference, but inferences always have to give way to actual fact. And the actual fact here is Mr. Ublasi underwent the conservative measures, and the conservative measures failed. And therefore, by the analysis of all of the medical doctors involved here, he should have been a candidate for the single-level fusion. What should not happen here is that the employer should be let off the hook, and the Medicare system or the Veterans Administration system have to pick up the cost of the surgery. That would be a tragedy. But what the commission did, what was very subtle about what the commission did concerning credibility, is they said the doctors aren't credible either, because everything that Mr. Ublasi said to them had to have been false. And they were false because he's not credible because of this videotape. And what was it that happened on the videotape that he was supposed to tell the doctors? I don't think – the doctors certainly would have understood that he drove to their office for an appointment. Your time is up, counsel. We'll have time in rebuttal. Thank you. Counsel, please. Good morning, Your Honors. May it please the court. Counsel, my name is Paul Salini. I'm here representing the Respondent IHC Construction. I guess the first thing I would need to address is the issue that counsel's brought up of a waiver. In looking at my brief, I certainly believe I cited to the record properly. So I guess I would ask you if there's something in this record that I did not cite to properly. Well, I think we're past that. We don't need to get into that today. Okay. I found it important simply because I think there's a couple things that went on in this brief that kind of throw things to the side of what the actual facts of the case are. Do you see that there's a problem with it? And in the future, I take it you'd be more careful. That's what I'm asking. I'm curious if you saw a problem with it, because I didn't think I had a problem with it. I thought I cited – I did cite to both. If I could waste, counsel, my time in argument on an issue the court is not interested in, I would focus specifically on your argument. I guess the first question that came up was with regard to the lumbar spine. And I think that some of the things that are in counsel's brief and what he's indicated here are not accurate. The first thing would be the initial Mercy Works form, which was 10-2505, which indicated mid-back complaints, not low back. When you look at the actual X-ray that it was taking, it was a thoracolumbar X-ray. It was a mid-back X-ray. It was not looking specifically at the low back. Then you go to the very first visit with Dr. Brash, which is 10-2705. That report specifically states upper back. There's absolutely nothing in there as far as somebody complaining specifically about the low back. There's no diagnosis per se. The next record is 11-705 Mercy Works. We're already to the point there where there's an indication of symptom magnification. That's the first reference to symptom magnification of this. I assume they're examination of the petitioner. And I think that's supported, Your Honor, by the subsequent findings. Again, we understand that Dr. Butler is a Section 12 examiner. He did find that. But Dr. Frank, a treating physician in this case, also found symptom magnification and non-organic pain signs with regard to this claimant. Taking that along with the videotape. You know, counsel indicates here that the videotape can't substitute for diagnosis or substitute for medical findings. What I would state in there is what it does is put his credibility into question. It's not indicating everything's false with regard to this individual. The idea that somehow if he's doing normal daily activities, that's not going to say much. What I think the arbitrator focused on was how he was doing that in these videos. At no point do you see any type of grimacing. At no point do you see any type of restriction. And it was significantly more than a few minutes of videotape. That's what I would say on that. Again, as you've indicated, there was no specific lumbar finding until 11-1705. Additionally, I would note that Dr. Butler referenced, as the petitioner did in his testimony, that there was some preexisting problems, both with regard to the cervical and lumbar spines. Nor in his treating records do you see reference to that. And I think that goes along with the idea of whether his treating physicians were credible in this case or whether their opinions could be relied upon such that the manifest weight of the evidence has been violated here. So you're saying Brash did support the claimant's position, correct? In terms of? In terms of there was a causal connection? Yes. I mean, there are actually treating physicians who found that. But that's also the opposite. And you said there's some documentary evidence in the records that would dispute the claimant's claim as well. Absolutely. And you got the video, too. Absolutely. And it's a matter of weighing the evidence. And I think the commission properly weighed the evidence such that there's certainly not a clearly apparent opposite conclusion in this case. Other things that are noted in the brief that I think are important. And, you know, with regard to the lumbar spine, there was very little objective evidence of any ‑‑ there was nothing in the MRI that showed anything acute. It was all degenerative conditions. An EMG was taken. No abnormalities were noted in there. You also will note as you go through the petitioner's treatment of this, it seems to vary in terms of where it is. At one point now it's going down one leg. Now it's going down two legs. Additionally, some of the ‑‑ if you look through his testimony and some of the records here, there are some unrelated conditions that are involved here. One was pointed out by Dr. Domingo was gout. There also he had undergone treatment for diverticulitis, which is in the abdominal area. Could that also have referenced pain to the petitioner's low back? Possibly. There also was a reference in there as to whether he had a deep vein thrombosis at some point during this. So there's lots of things that are going on with this, and I think the arbitrator and the commission did their best to make a determination on that. Specifically with regard to the cervical spine, one of the things I found in the brief that I had a lot of difficulty with, the plaintiff's brief, was there was a consistent reference to the EMG showing an abnormality in the cervical spine. I completely disagree with that. There were two EMGs taken. One was in 2006. One was in 2007. The first one indicated nothing with regard to the cervical spine. It found an entrapment at the Guyon's Canal in the arm. The second one not only found nothing with regard to the cervical condition, there was nothing at that point with regard to the Guyon's Canal either. Another reference that comes up here is the idea that simply because there's a pathology of some sort or another found on an MRI, that that immediately means that there's some kind of surgery required without any reference to the subjective complaints of the petitioner. And I completely disagree with that. In this case, certainly, was there some finding in the MRI that there was an abnormality in the cervical spine? Yes. We have evidence that this gentleman had had prior cervical problems. Number one. Number two, I don't know any doctors who will go to a petitioner and say, I'm going to perform a surgery on you simply based on what I see on an MRI. If they did that, we would all probably have fusions at this point. It's necessitated that they have to rely upon the subjective complaints of the plaintiff in this case or the petitioner. As we've gone through, and as I go through in my brief, there's multiple references as to why this gentleman was not credible. It does not automatically mean this man's a liar. He absolutely doesn't tell the truth. But what happens when people exaggerate their complaints or they do things that aren't credible is it takes everything to a speculative point. It leaves us to a point where we don't know what the actual complaints are and what they're not. And I think that's exactly what happened in this case. With regard to Dr. Butler, one of the things I would say is I think Dr. Butler, by his first initial report, absolutely showed his credibility in this case. Until he knew of all these other things that put the petitioner's complaints into question, he was on the petitioner's side in that first report. That's why he agreed, yes, if these subjective complaints continue after this treatment, surgery would be reasonable. And by the second time he saw them, he had the videotape, you had findings of symptom magnification. That's what changed things in this case. And I don't think anybody would argue that simply because there's a finding on the cervical spine, that that automatically means surgery without reference to the subjective complaints by the petitioner. And I would also reference that with regard to Drs. Yappour and Dr. Brown. Because they obviously came into this case late, and neither of them had any reference point to any of these things. All they were doing was relying upon what they had. As soon as they got that report of Dr. Butler, they knew the video existed. Nobody requested that video. Nobody requested that that video be presented to his doctors so that they could opine on it. And I think when you look at the video and you look at the conclusions of the commission, you know exactly why nobody showed those doctors that video. Because it clearly shows a man that's exaggerated. When you take that video and what you see in it versus the complaints he's making in the medical records, you see a vast difference. And that's why that happened. So I'd rely upon those arguments, Your Honors, as well as what's in the brief. And we would ask that the court affirm in total the decision of the commission. Thank you. No further? Not having been the attorney who initially handled this case or tried it, I can't answer whether that videotape was demanded or not. However, having seen the videotape, what exactly is it on the videotape that would possibly suggest that a gentleman whose MRIs, multiple cervical MRIs, and failure to respond to therapy or injections would not be in need of the surgery? That's a good question, I'll admit. But did anybody cross-examine Butler on why, what he saw in the video that changed his opinion? Dr. Butler was not deposed. All right. And you can't address why? I can't address why. Dr. Butler was not deposed. But I can say this. What he did, when he saw the claimant the second time, he readily acknowledges he was not provided medical records. He didn't know what injections had been administered. He hadn't seen therapy records. He makes a characterization of there being scant medical evidence. That may be true for him, but there was a lot of medical evidence that was available. All Dr. Butler was given was this videotape. He didn't have the medical records. So his opinion that the claimant is suffering from a cervical strain isn't based on the review of the medical records. It's based on a review of the videotape. And that's where we're saying that the videotape has been given far too much importance in this case, way out of proportion to what it should be. And therefore, the commission abused its discretion by allowing that videotape to be something that could strike down the credibility of the claimant when he's talking to his doctors and can completely disregard the objective medical evidence. There's no faking what's on the MRIs. There's no faking the response to the injections. There's no faking what the response was to the therapist. The therapist didn't say he was malingering, failing to cooperate, not coming in, missing appointments. He was making all of his appointments. He was going to therapy. He was giving a good effort, and none of it worked. He still had the ridiculous symptoms down the arms, and also he eventually developed it down both of the legs. With respect to Dr. Yapur and Dr. Brown, only being able to go by what the claimant told them, that's simply not true. They ordered diagnostic tests. They reviewed those diagnostic tests. And based on those diagnostic tests, they made their conclusions. These aren't physicians who can have the wool pulled over their eyes easily. Dr. Wesley Yapur is a neurosurgeon. He's been around a long time. Dr. Brown has been around a long time. These are two physicians from two facilities that I don't think are traditionally related, or typically you find in treatment, in workers' comp cases, CINN and Northwestern. They had the proper information before them to make their conclusions, this man needed surgery. When Dr. Butler looked at the medical records, he made the same conclusion. Only when he didn't look at the records and only considered the videotape. With respect to the preexisting conditions, there were findings of degenerative findings in the claimant's cervical spine. And there were findings of degenerative changes in the lumbar spine. But there is no evidence in this record that he had a prior condition, that he had had a prior injury, or that there was, he was even aware that these symptoms had existed. He testified that prior to beginning work that day, he was fine, he wasn't having any problems. Thank you. Court will take the matter under indictment for disposition.